## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| TAMMY M. STEVENS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 05-0068-BH-B |
| SIMPLEXGRINNELL, LP, | ) | |
| | ) | |
| Defendant. | ) | |

### FINDINGS OF FACT; CONCLUSIONS OF LAW;
### AND ORDER

This action is before the Court on defendant's motion for summary judgment (Docs. 18-19) and motion to strike plaintiff's affidavit (Doc. 26). According to the plaintiff, Tammy Stevens, she was employed by the defendant, SimplexGrinnell, "from February 23, 2004 through November 30, 2004." Opposition Brief (Doc. 24) at 2. In this litigation, Stevens initially alleged three claims: (1) for overtime allegedly due under the Fair Labor Standards Act ("FLSA"); (2) for alleged breach of "an express or implied contract" concerning commission income; and (3) for alleged violation of Ala. Code § 8-24-1 *et seq., "*Sales Representative's Commission Contracts Act*."* In her opposition to summary judgment, however, Stevens only responds to defendant's arguments regarding her overtime claim. Consequently, the Court agrees that Stevens has abandoned her claims for alleged breach of "an express or implied contract" concerning commission income; and for alleged violation of Ala. Code § 8-24-1 *et seq.,* by failing to present either disputes of fact or argument against summary judgment on those claims.

Upon consideration of defendant's motions, plaintiff's responses (Docs. 24 and 27) in opposition to the motion for summary judgment and the motion to strike, defendant's reply (Doc. 25), and all other pertinent portions of the record, the Court concludes that both defendant's motions are due to be granted for the reasons stated therein.

The Court specifically concludes, with respect to the motion to strike, that the plaintiff's affidavit fails to provide any specific facts to support her overtime claim, but instead proffers improper speculation and hearsay. *See e.g., Edwards v. Wallace Community College,* 49 F.3d 1517, 1522 (11th Cir. 1995)(An affiant's statement concerning her own subjective beliefs is inadmissible.); *Evers v. General Motors Corp.,* 770 F.2d 984, 986 (11th Cir. 1985)(Rejected affidavit on the grounds that it "fails to provide any specific facts to support appellant's claim [because, *inter alia,*] conclusory allegations without specific supporting facts have no probative value."). *See also,* *Wadsworth v. Nalso Chem. Co.,* 523 F.Supp. 997, 1000 (N.D. Ala. 1981)("[T]he plaintiff cannot merely rest upon a vague claim that a genuine issue of fact exists."), *aff'd* 679 F.2d 251 (11th Cir. 1982). It is therefore **ORDERED** at the outset that defendant's motion to strike plaintiff's affidavit be and is hereby **GRANTED**.

## FINDINGS OF FACT

The Court has considered all the evidence of record, both testimonial and documentary, and finds that the following facts are undisputed or uncontradicted by the plaintiff.

1.      Tammy M. Stevens began working at SimplexGrinnell after posting her

resume on the internet via "Monster.com." SimplexGrinnell is engaged in the business of selling, installing, servicing, and inspecting commercial building sprinkler systems and other fire related products and services. Stevens' highest level of education is a high school diploma. (Tab A, Stevens Dep. at p. 9, l. 1-7).[1]

2.      Stevens posted her resume for a sales position. (Tab A, Stevens Dep. at p. 9, l. 1-9). Stevens acknowledges that she was "hired by SimplexGrinnell to sell preventative maintenance agreements for the inspection of commercial sprinkler systems," and that she was employed as a Preventive Maintenance Agreement ("PMA") Sales Representative. Opposition Brief (Doc. 24) at ¶¶ 3 and 4. Stevens does not dispute that SimplexGrinnell offered her that position on February 9, 2004.

3.      A PMA Sales Representative sells Preventative Maintenance Agreements to customers. (Tab A, Stevens Dep. at p. 13, l. 21-25).

4.      A Preventative Maintenance Agreement is a service agreement between SimplexGrinnell and its customers regarding service and maintenance on indoor sprinkler systems. (Tab A, Stevens Dep. at p. 14, l.1 - p.15, l. 14; Tab B, ¶ 3).

5.      SimplexGrinnell offered a number of different service plans under the PMA program. (Tab A, Stevens Dep. at p. 14, l. 1 – p. 15, l. 14).

6.      Stevens did not sell any wholesale goods or products as part of her duties at SimplexGrinnell. (Tab A, Stevens Dep. at p. 27, l. 13-15).

---

[1]Reference is hereafter made to defendant's evidence (Doc. 21) submitted in support of the motion for summary judgment.

7.      Stevens signed a PMA Sales Representative Commission Plan for fiscal year 2004, on March 8, 2004, soon after her hire.  (Tab A, Exh. 11).

8.      The 2004 Commission Plan explains the different commission rates, compensation specifics, product prices and how and when commission is earned.  (Tab B, Murphy Aff. at ¶ 8).  The 2004 Commission Plan also specifically discusses the commissions paid on "renewal" contracts which are assigned to the PMA Sales Representative.  (Tab A, Exh. 11; Tab B, Murphy Aff. at ¶ 7).   Stevens has proffered no evidence to refute the evidence presented which establishes her entitlement to a commission for the renewal of assigned contracts in her territory.

9.      The Commission Plan states that if the participant is terminated, quits or is fired before the end of the fiscal month, quarter or year, the participant will not receive any unpaid commission compensation. (Tab A, Stevens Dep. at  p. 98, l. 12-23; Exh. 11; Tab B, Murphy Aff. at ¶ 9).

10.     Stevens' duties, responsibilities and goals as a PMA Sales Representative are described in a document entitled "Exempt Position Description" for a "PMA Sales Representative."  (Tab A, Stevens Dep. at p. 12, l. 1-21; Exh. 8).

11.     Stevens does not dispute that, according to the aforementioned job description, her duties and responsibilities as a PMA Sales Representative included:

**RESPONSIBILITIES**

- Establish contact with prospects and qualify potential buyers of service contracts by scheduling sales call, following up of leads and utilizing outlined marketing strategies

4

- Determine customer needs and develop a sales strategy to gain customer understanding of company service offerings
- Close sufficient sales to minimally meet sales plan objectives
- Develop and maintaining an active proposal backlog to support designed sales plan
- Conduct building surveys to support development of sales estimates
- Maintain correct and complete sales records and records of all sales related activities
- Submit required sales reports, expenses, competitive activity and correspondence in a timely manner
- Develop a positive ongoing relationship with customers to ensure that SimplexGrinnell is meeting requirements to ensure long-term customer loyalty
- Support the service department towards achieving customer excellence as well as working with other departments to generate leads for service or equipment/device upgrades
- Meeting key objectives of the annual commission plan
- Perform other duties as required

**SCOPE:**

Responsible for meeting sales goals of assigned territory and working with all district personnel necessary to accomplish goal and satisfy customer requirements.

Compensation will be based on the current fiscal year's Compensation Incentive Plan for PMA Sales Representatives.

(Tab A, Stevens Dep. at pp. 75-77; Exh. 8).

12.     As a PMA Sales Representative, Stevens was paid an annualized salary of $30,000 plus commission from March through October 1, 2004. (Tab A, Stevens Dep. at p. 30; Tab B, Murphy Aff. at ¶ 7). Although Stevens proffers her opinion that she was paid a $30,000 annual salary for "servicing existing accounts" and that she was "paid a commission for all new customer accounts," she has proffered no evidence to support

such speculation.[2]

13.     Nor has Stevens proffered any evidence to dispute the fact that her

commission was calculated at 8% of the dollar amount of the PMAs sold. (Tab A, Stevens

Dep. at p. 30; Tab B, Murphy Aff. at ¶ 7).   It is also undisputed that Stevens' 2004

Commission Plan allows for payment of commissions after they have been invoiced. (Tab

A, Exh. 11, p. 2).  According to Stevens, during the approximately nine (9) months of her

employment with SimplexGrinnell, she received approximately $6,069.16 in

commissions.[3]  Opposition Brief at ¶ 6.

14.     As to Stevens' sales territory, initially she had the Alabama/Mississippi

Gulf Coast territory, and subsequently she had the Florida Panhandle territory.  (Tab A,

Stevens Dep. at p. 20, l. 1-22; Tab B, Murphy Aff. at ¶ 4).  Stevens calculated she had

200-300 customers located from Mississippi to Panama City. (Tab A, Stevens Dep. at p.

20, l. 4-9).

15.     Stevens could earn commissions on existing PMA contracts sold by others

if she was able to sell upgrades, additional services or renew the contracts. (Tab A,

Stevens Dep. at p. 126, l. 4 – p. 127, l. 17; Exh. 11).

---

[2]The fact that the $30,000.00 annual salary is not mentioned in the document describing the commission plan is not evidence to support plaintiff's contention that such salary was "not compensation for any sales related activities."

[3]In her sworn interrogatory responses Stevens states she sold $160,000 in contracts; however during her deposition Stevens changed this response admitting that invoiced sales totaled "close to $52,000." (Tab A, Stevens Dep. at  p. 98, l. 24 –  p. 99, l. 22, p. 38 , l. 1 – p. 40, l. 22; Exh. 10).

16.     In order to give a quote to a customer, Stevens would have to visit the
customer, measure and count the peripherals to their fire alarm system such as number of
smoke detectors, lights, audio, visual, horns, etc. and utilize her laptop to calculate the
figures. (Tab A, Stevens Dep. at p. 19, l. 12-25).   There was a charge for each peripheral.
(Tab A, Stevens Dep. at p.20,  l. 23-25).

17.     In order to price a particular service plan, Plaintiff would utilize her laptop
computer,  provided by SimplexGrinnell. (Tab A, Stevens Dep. at p. 15, l. 12-25).
Stevens was also provided with a cell phone by SimplexGrinnell. (Tab A, Stevens Dep. at
p. 16, l. 16-21).

18.     Stevens' immediate supervisor for the majority of her tenure was Glen
Weaver. (Tab A, Stevens Dep. at p. 17, l. 4-6).[4]  Stevens met with Weaver every Monday
for approximately an hour at the office in Mobile to review her accounts and potential
sales.  She would also discuss any customer service or  billing issues on accounts in her
territory. (Tab A, Stevens Dep. at pp. 18-19).

19.     Following these Monday morning meetings, Stevens would either work on
sales quotes in the office or travel to Florida for an appointment. (Tab A, Stevens Dep. at
p. 18, l. 5 – p. 19, l. 8; Tab B, Murphy Aff. at ¶  5).  During the remainder of the week,
Stevens traveled her sales territory and met with existing or potential sales customers.
(Tab A, Stevens Dep. at p.120, l. 25 – p. 121, l. 23; Tab B, Murphy Aff. at ¶  5).  Stevens'

---

[4] During Stevens' last few weeks with SimplexGrinnell, Henry Murphy became her supervisor
(Tab A, Stevens Dep. at p. 17, l. 23 – p. 18, l. 4).

typical day involved traveling her territory to appointments or making cold calls. (Tab A, Stevens Dep. at p. 21, l. 18-20).  Stevens confirmed that she had appointments with customers **every day**. (Tab A, Stevens Dep. at p. 22, 4-7).

20.     In conjunction with her sales duties, Stevens would handle billing and customer service issues connected to the PMAs sold in her territory. (Tab A, Stevens Dep. at p. 22, l. 9-20; Tab B, Murphy Aff. at ¶ 6).  Stevens would answer customer questions regarding their PMA contract or deal with customer complaints related to technicians. (Tab A, Stevens Dep. at p 27, l. 19 – p. 28, l. 23).  Stevens did not actually perform service on the equipment; this work was performed by service technicians.  (Tab A, Stevens Dep. at p. 23, l. 19 – p. 24, l. 22).

22.     Although Stevens argues that "she spent between fifty and sixty percent of her time performing customer service duties which were unrelated to her sales activities," she has proffered no evidence to support such a contention and, during her deposition, she could only recall four such appointments during her nine month tenure.[5]  (*Cf.,* Opposition Brief at ¶8 and Tab A, Stevens Dep. at p. 22, l. 21 – p. 23, l. 10; p. 115, l. 10 – p. 116, l. 3; p. 133, l. 23 –p. 134, l. 5).  Each of the customers that Stevens identified as having "customer service" or "billing issues" received proposals from Stevens for new PMA sales.  (Tab A, Stevens Dep. at p. 122, l. 2 – p. 126, l. 17; TAB C - UNDER SEAL).

---

[5] Stevens testified that she responded to billing questions from a client named Sterling Beach; however, she later explained that an office employee named Monica actually handled the issue. (Tab A, Stevens Dep. at p. 122, l. 16 – p. 124, l. 20).

8

23.    The summary of her records of activity (with her annotations during the deposition) shows, as follows:

    a.    Sales contact with Young's Realty on April 1, 2004, leading to a signed contract on May 3, 2004.  (Tab A, Plfs & Dfts Exh.1).

    b.    Two contacts with Destin West Bayside on June 14, 2004 and says "Fax from E. Carol Thomas to Stevens attaching monitoring agreement. Will review remaining portions of contract & finalize later" which Plaintiff testified resulted in a $3,000 sale. (Tab A, p. 66, l.5 – p. 67, l. 2, Plfs & Dfts Exh. 1).

    c.    Several sales contacts with various Sterling properties including sales to Sterling Resorts ($4,394.20 on 08/13/04) and Sterling Beach Condo ($4,516.66 on 8/16/04), as well as a sales proposal to Sterling Sands on August 20, 2004 (Tab A, Plfs & Dfts Exh.1).

24.    Stevens also made proposals to Majestic Sun (Tab A, Stevens Dep. at p. 122, l. 2 – p. 123, l. 5; TAB C - UNDER SEAL).

25.    Stevens has, in fact, proffered no evidence to establish that she spent more than twenty (20%) percent of her time on non-sales related activities.  When asked directly whether Stevens had any records of the days she worked and the hours she worked, Stevens testified that she did not.  (Tab A, Stevens Dep. at p. 120, l. 20-24).

26.    Stevens was also eligible for an end-of-the-year bonus on any renewals of assigned contracts in her territory. (Tab A, Stevens Dep. at p. 135, l. 13 – p. 137, l. 6). Notwithstanding Stevens' contentions to the contrary, her own Business Plan for 2005 recognizes that contact with existing customers was necessary to her goal to "Achieve

100% retention" and acknowledged that the retention of customers was a responsibility of her sales job.  (Tab B, Attachment A - UNDER SEAL).  Stevens also conceded that she could earn compensation for retaining 95% or more of her assigned contracts.  (Tab A, Exh. 11; Tab A, Stevens Dep. at p.138, l. 24 - p. 139, l. 5).

27.    While she was employed with SimplexGrinnell, Stevens took a second job with Logan's Roadhouse restaurant on or about October 3, 2004. (Tab A, Stevens Dep. at p. 26, l. 9 –p. 27, l.. 12; Exh. 7).  On her application with Logan's, Stevens stated that she was a PMA Sales Representative for SimplexGrinnell. (Tab A, Exh. 6).  From October 3, 2004, – January 9, 2005, Stevens worked over 20 hours per week for Logan's. (Tab A, Exh. 7).

28.    In addition, during her nine months with SimplexGrinnell, Stevens took a five day vacation. (Tab A, Stevens Dep. at p. 106, l. 19-23).

29.    SimplexGrinnell's fiscal year runs from October 1 – September 30. (Tab A, Stevens Dep. at p. 40, l. 12 - 16).  Stevens sold $51,645.03 in PMAs which was invoiced through September 25, 2004. (Tab A, Stevens Dep. at p. 42, l.  7-15; Exh. 2).

30.    In fiscal year 2005, starting on October 1, 2004, Stevens spoke with Henry Murphy about the new PMA sales plan.  (Tab A., Stevens Dep. at p. 103, l. 10-13; Tab B, ¶ 11).  The new plan placed PMA Sales Representatives on a pay system which was based on a draw plus commissions, in contrast to the previous plan which was salary plus commissions.  (Tab A, Stevens Dep. at p. 103,  l. 10-23; Tab B, ¶ 11).

31.    Stevens' Business Plan for 2005 included a Mission Statement which read

10

"Maximize my days in the field to exceed my customers' expectations to sell

successfully. (Tab B, Attachment A – UNDER SEAL).  The "Objectives and Goals"

section included: achieving 150% of quota; quoting at least 1.2 million annually; quoting

at least 5 new accounts and 5 upgrades; closing at least 30% of all quotes, utilizing all

possible resources such as (1) warranty reports; (2) SOS Leads; (3) networking all

groups; and (4) A & D reports; achieving 100% retention initiative by following up on

renewal accounts 6 months in advance; qualifying for bonuses, etc. (Tab B, Attachment A

– UNDER SEAL).

     32.    Stevens voluntarily quit her position on or about December 1, 2004. (Tab B,

¶ 12).

**CONCLUSIONS OF LAW**

    1.    <u>**Summary Judgment Standard**</u>

    A defendant is entitled to summary judgment "if the pleadings, depositions,

answers to interrogatories and . . . affidavits . . . show that there is no ***genuine*** issue as to

any ***material*** fact and that [the defendant is] entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(c)  (emphasis added).  Under Rule 56(c):

> A factual dispute is "genuine" if the evidence is such that a
> reasonable jury could return a verdict for the non-moving
> party.  A fact is "material" if it might affect the outcome of
> the suit under governing substantive law.

*Beck v. Somerset Technologies, Inc.,* 882 F.2d 993, 996 (5th Cir. 1989) (citing *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Where the record taken as a whole could

11

not lead a rational trier of fact to find for [the plaintiffs], there is no genuine issue for

trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

Summary judgment is appropriate if the plaintiff fails to produce sufficient evidence to

raise a genuine issue of material fact on the existence of an essential element of their

claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986*); Manor Healthcare Corp.

V. Lomelo,* 929 F.2d 633, 636 (11th Cir. 1991).  In considering defendants' motions for

summary judgment, the Court views the facts presented, together with all reasonable

inferences arising from the facts, in the light most favorable to the plaintiff.  *Adickes v.

S.H. Kress & Co.,* 398 U.S. 144, 157 (1970); *Cooper v. Southern Co.*, 390 F.3d 695, 723

(11th Cir. 2004). As the moving party, the defendant has the initial burden of showing the

absence of a genuine issue of material fact.  *Id.*  Once the defendant makes that showing,

the burden shifts to the plaintiff to "come forward with *specific* facts showing that there is

a genuine issue for trial."  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87 (1986).

Confronted with a properly supported motion for summary judgment, the plaintiff must

adduce admissible evidence which creates a material factual dispute.  *Clarke v. Coats &

Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).    Plaintiff must do more than "simply

show there is some metaphysical doubt as to the material facts."  *Anderson,* 477 U.S. at

251-52.  She must produce evidence.  *Id.*  In addition, plaintiff cannot rely upon evidence

which is inconsistent with her prior sworn deposition testimony.  *See, Van T. Junkins &

Assoc., Inc. v. United States Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984)("when a party

has given clear answers to unambiguous questions which negate the existence of any

genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.").

2.      **Claim for Overtime**[6]

Stevens claims is predicated on 29 U.S.C. § 207 of the FSLA which provides that all employees are entitled to receive overtime compensation for hours worked in a week in excess of forty hours at a rate of pay one and one-half times their regular rate of pay unless they are exempt employees pursuant to 29 U.S.C. § 213 and as further defined by the regulations promulgated by the Department of Labor.  There is no dispute that 29 U.S.C. § 213(a) exempts outside sales employees from the overtime provisions of the FLSA.  An "outside salesman" is defined in the regulations as:

> (a) who is employed for the purpose of and who is customarily and regularly engaged away from his employer's place or places of business in:
>
>> (1) making sales within the meaning of section 3(k) of the Act; or
>>
>> (2) Obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and
>
> (b) Whose hours of work of a nature other than that described in paragraph (a)(1) or (2) of this section do not exceed 20 percent of the hours worked in the workweek by nonexempt employees of the employer:

---

[6]As stated previously, Stevens abandoned all other claims by addressing only her overtime claim in opposition to defendant's motion for summary judgment.

13

> *Provided, That work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall not be regarded as nonexempt work.*

29 C.F.R. § 541.500 (emphasis added).   The legislative rationale for such an exemption of outside sales employees was succinctly addressed in *Jewel Tea Co. v. Williams*:

> In lieu of overtime, [the outside sales employee] ordinarily receives commissions as extra compensation.  He works away from the employer's place of business, is not subject to the personal supervision of his employer, and his employer has no way of knowing the number of hours he works per day.  To apply hourly standards primarily devised for an employee on a fixed hourly wage is incompatible with the individual character of the work of an outside salesman.

118 F.2d 202, 207-208 (10th Cir. 1941).

The Department of Labor regulations require that, in order to be exempt as an outside sales employee, the employee must not have devoted more than twenty percent of his or her time to non-sales related activities.  29 C.F.R. § 541.500(b).  Stevens acknowledges that "sales related activities may include duties which would otherwise not appear to be sales related if they are performed 'incidental to or in conjunction with the employee's own outside sales...' [or, in other words]. . . if they are performed by the outside salesman for the purpose of promoting his or her own sales."  Opposition Brief at 10, *quoting*, 29 C.F.R. § 541.500(b).  The evidence of record establishes that, even on those occasions when Stevens was asked to resolve billing or customer service issues connected to the PMA's sold in her territory but by another sales employee, such duties were related to her sales activities inasmuch as she not only had but took the opportunity

14

on those occasion to develop and propose her own sales contract to the customer.[7]  There is simply no evidence that Stevens was ever precluded from promoting her own sales, either for contract renewal or upgrade, during any visit to any customer of SimplexGrinnell, or that she was ever required to devote more than twenty percent of her time on duties unrelated to her sales duties.  There is ample evidence that Stevens recognized and acted upon her duty to "Achieve 100% retention" of the customers in her territory, and her eligibility for an end-of-year bonus on any renewals or upgrades of contracts in her territory.  Stevens arguments to the contrary are without evidentiary foundation and clearly specious.  *See e.g.,* Tab A, Plfs & Dfts Exh.1.

While it is true that "[t]he exemption as an outside sales employee must be narrowly construed against the employer who must prove the exemption by unmistakable evidence" (Opposition Brief at 17, *citing, Donovan v. Walter W. Cheney, Inc.*, 510 F.Supp. 748 (D. N.H. 1981))," SimplexGrinnell has produced sufficient evidence to establish that Stevens' work was "incidental to and in conjunction with [her] own outside sales or

---

[7]*See e.g.,  Ackerman v. Coca Cola Enterprises, Inc.*, 179 F.3d 1260, 1265 (10th Cir. 1999)("[A] key inquiry is whether the employee in question actually consummates the sale of his or her employer's products at a particular location. If that employee consummates the sale but also performs a variety of other tasks intended to promote the company's products but not directly involving sales, those tasks may still be considered "incidental to and in conjunction with" those sales. On the other hand, if the employee in question does not actually consummate the sale at the location in question, then his other activities, even if closely related to sales, are not "incidental to and in conjunction with" those sales under the regulations. . . . In the case before us, the record indicates that, as advance sales representatives and account managers, the plaintiffs consummated the sales of Coca-Cola products at the stores that they visited.").  *See also, Fields v. AOL Time Warner*, 261 F.Supp.2d 971, 977 (W.D. Tenn. 2003)(On a motion for summary judgment, the court found that the auditing of nonpaying customers frequently led to a sale because nonpaying customers frequently entered into a contract to pay for the service to avoid having their service disconnected.)

solicitations" and thus exempt.  SimplexGrinnell is therefore entitled to judgment in its favor as a matter of law with respect to Stevens' FLSA claim for overtime.

### CONCLUSION AND ORDER

For the reasons stated above, the Court concludes and it is therefore **ORDERED** that defendant's motions for summary judgment and to strike plaintiff's affidavit are due to be and are hereby **GRANTED** and that **JUDGMENT** be entered in favor of the defendant, SimplexGrinnell, LP, and against the plaintiff, Tammy M. Stevens, the plaintiff to have and recover nothing of the defendant.  Costs are taxed against the plaintiff.

**DONE** this 12th day of January, 2006.

       s/ W. B. Hand

SENIOR DISTRICT JUDGE